[No. 25963-6-I.   Division One.   August 5, 1991.]

JACK E. READ, *Appellant,* v. THE EMPLOYMENT
SECURITY DEPARTMENT, *Respondent.*

JAMES L. CHRISTENSEN, *Appellant,* v. THE EMPLOYMENT
SECURITY DEPARTMENT, *Respondent.*

EARL W. FREDERICK, *Appellant,* v. THE EMPLOYMENT
SECURITY DEPARTMENT, *Respondent.*

*William B. Knowles* and *James Wagemann,* for appellants.

*Kenneth O. Eikenberry, Attorney General,* and *Geoffrey Jones, Assistant,* for respondent.

COLEMAN, J. — Jack Read, Earl Frederick, and James Christensen assert in this consolidated appeal that the trial court erred by affirming the findings of the Commissioner of the Employment Security Department (the Department) that each claimant voluntarily left his employment with Tacoma News, Inc., without good cause pursuant to RCW 50.20.050 and, thus, did not qualify for unemployment benefits. We affirm.

On July 12, 1988, Tacoma News circulated a memorandum in its various departments announcing the implementation of an early retirement plan for qualified

employees, largely because of the company's need to reduce operating costs. That retirement plan was identified in the memorandum as "voluntary" and offered employees the option of receiving $1,000 per month for 36 consecutive months or a lump sum of $33,000 if their applications for retirement were accepted.

In addition, on July 17, 1988, the *Tacoma News Tribune* published an article about employment layoffs and cutbacks in which the managing editor of the newspaper announced:

> When all the dust clears, we will have reduced our total work force by about 25 positions through a combination of attrition, early retirement and job eliminations. We have more than 750 full- and part-time employees.
>
> . . . .
>
> As we've discussed in this space previously, The News Tribune is working on a merit system. In thinning the ranks, we first identified jobs that could be eliminated without injuring the product. We then reviewed the performance of the various people doing those targeted jobs. Those with the lowest performance were the most vulnerable. Where performance was equal, we turned to seniority, keeping the veteran.
>
> For those displaced, there's a severance [] of a month's pay plus medical benefits and help in finding a new job.

Approximately 12 employees applied for and were granted the early retirement package and another 12 to 15 employees were laid off. No one working in the mail room or in any of the other production departments was laid off. Those employees who were laid off had worked in the newsroom as reporters and editors.

Jack Read, Earl Frederick, and James Christensen were among the employees of Tacoma News who elected to apply for early retirement. Read had begun working in the company's mail room in 1976. Upon learning of the early retirement opportunity, Read completed the required application form, even though he was 6 months younger than the specified minimum age (48 years old) to

qualify for the plan. Read's application was approved and his employment was terminated as of August 2, 1988.

When Read later applied for unemployment benefits from the Department, he was awarded benefits as of August 20, 1988, because the Department concluded Read had been "discharged" from employment under RCW 50.20.060 for a nondisqualifying reason.[1] On appeal, however, the Seattle Office of Administrative Hearings (OAH) reversed, disqualifying Read from benefits after finding that he had voluntarily left work without "good cause" as required under RCW 50.20.050.[2] OAH found that "[t]here were no plans by the employer to lay off [Read] or discharge him for any reason." Read subsequently appealed to the Commissioner, who affirmed the OAH decision.

Earl Frederick worked in the mail room of Tacoma News from September 23, 1968, until July 17, 1988. He, like Read, applied for the early retirement package offered by the company. Frederick testified that he accepted the early retirement plan because he felt that the job was "getting harder all the time" and because he had to stand on a cement floor for 7-hour shifts.

---

[1] RCW 50.20.060(1) reads:

"**Disqualification from benefits due to misconduct, felony, or gross misdemeanor.** (1) An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he or she has been discharged or suspended for misconduct connected with his or her work and thereafter until he or she has obtained work and earned wages of not less than the suspended weekly benefit amount in each of five calendar weeks. . . .

"(2) An individual who has been discharged because of a felony or a gross misdemeanor of which he or she has been convicted, or has admitted committing to a competent authority, and which is connected with his or her work shall be disqualified from receiving any benefits for which base year credits are earned in any employment prior to the discharge."

[2] RCW 50.20.050(1) reads in pertinent part:

"**Disqualification for leaving work voluntarily without good cause.** (1) An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he or she has left work voluntarily without good cause and thereafter until he or she has obtained bona fide work and earned wages of not less than his or her suspended weekly benefit amount in each of five calendar weeks."

Frederick's application for unemployment benefits was denied by the Department, and that decision was later affirmed by OAH. The administrative law judge at OAH found that "[b]ut for [the voluntary retirement] package [Frederick] would not have resigned at the time he did despite other reasons he advanced for doing so." The ALJ also made the finding that Frederick's job was "relatively safe and that thus if he had not accepted this resignation retirement package, he would not have been discharged or laid off." On appeal, the Commissioner affirmed.

James Christensen, the third claimant, worked for Tacoma News until July 1988 when he applied for and was granted early retirement. Although the Department initially granted Christensen unemployment benefits, OAH modified that original determination and denied further benefits to him, finding that he voluntarily left work without "good cause" pursuant to RCW 50.20.050. OAH found that Christensen "would not have voluntarily quit except for the [volunteer retirement] program." In addition, OAH concluded from the testimony presented that the "evidence fail[ed] to establish that the claimant was in imminent danger of involuntary termination had he not volunteered to quit under the [volunteer retirement] program." The Commissioner affirmed that determination. The Commissioner also determined that Tacoma News had not made any announcement or decision to lay off employees as the employer had in *Morillo v. Director of Div. of Empl. Sec.*, 394 Mass. 765, 477 N.E.2d 412 (1985), a case relied upon by the claimants. Each claimant challenged the Commissioner's decisions in a consolidated appeal to the Superior Court, and the court affirmed the Commissioner's rulings. All three claimants appeal.

We first determine whether RCW 50.20.050 (the "voluntary quit" provision) or RCW 50.20.060 (the "discharge" provision) governs this case. The claimants argue that RCW 50.20.060 controls because they were not "at fault" for bringing about their unemployment and because each man had a "reasonable basis to believe" that his position

would be eliminated because of the employer's plan to reduce costs. They further assert that *Morillo* is persuasive authority for their position that they did not leave their employment "voluntarily". In contrast, the Attorney General, representing the Department, argues that the Commissioner correctly concluded that each of the claimants had voluntarily left his job without good cause so that RCW 50.20.050 is determinative.

██ ██ The administrative procedure act governs court review of administrative proceedings.[3] Former RCW 34.04; *Kenna v. Department of Empl. Sec.*, 14 Wn. App. 898, 905, 545 P.2d 1248 (1976). The correct standard of review depends upon whether the issue presented is one of fact, one of law, or a mixed issue of fact and law.[4] *Rasmussen v. Department of Empl. Sec.*, 98 Wn.2d 846, 849, 658 P.2d 1240 (1983). The Commissioner's determination is a conclusion of law reviewable according to the "error of law" standard of former RCW 34.04.130(6)(d).[5] *See Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 390, 687 P.2d 195 (1984). In addition, the Commissioner's decision

---

[3]Because these administrative appeals were filed before the amendments to the administrative procedure act were made (RCW 34.05), the former act controls. *See* RCW 34.05.902.

[4]The "clearly erroneous" standard applies to factual issues. *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983). For issues of law or mixed issues of fact and law, the "error of law" standard applies. *Rasmussen v. Department of Empl. Sec.*, 98 Wn.2d 846, 849-50, 658 P.2d 1240 (1983); *Franklin Cy.*, at 325, 329-30. *See* former RCW 34.04.130(6).

[5]Former RCW 34.04.130(6) reads: "The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
    "(a) in violation of constitutional provisions; or
    "(b) in excess of the statutory authority or jurisdiction of the agency; or
    "(c) made upon unlawful procedure; or
    "(d) affected by other error of law; or
    "(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or
    "(f) arbitrary or capricious."

is prima facie correct, and the burden of proof is upon the party opposing that decision. RCW 50.32.150.

■ As *Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 388-89, 687 P.2d 195 (1984) aptly stated:

> The Employment Security Act, RCW Title 50, sets aside unemployment reserves to be used for the benefit of persons unemployed through no fault of their own. RCW 50.01.010. In general, to accomplish this end, the act provides for the payment of unemployment benefits to unemployed individuals unless a claimant is disqualified from receiving such benefits. Two qualification provisions, RCW 50.20.050 and RCW 50.20.060, are at issue in this case. Each section dictates whether an individual claimant is or is not disqualified from receiving benefits in a given case. *However, both sections will not apply to the same set of facts.*
>
> RCW 50.20.050(1) states that an individual is disqualified from receiving benefits if he or she left work voluntarily without good cause. Thus, if a worker "voluntarily quits" her job, she will be denied benefits unless she has "good cause" for quitting. RCW 50.20.060(1) states that an individual is disqualified from receiving benefits if he or she is discharged for misconduct. Thus, if a person is "discharged" by her employer, she will be eligible for benefits unless she was terminated for "misconduct". A fortiori, how the job separation is initially characterized, either voluntary quit or discharge, will trigger which statutory section, and, which analytical inquiry, will appropriately apply to the facts at issue.

(Italics ours.) *Safeco*, at 388-89. The terms "left work voluntarily" in RCW 50.20.050 and "discharged" in RCW 50.20.060 are legal terms, and the facts of a case determine which section controls. *Safeco*, at 390. For a claimant to be eligible for unemployment benefits, regardless of whether the employment ended because of discharge or because the claimant voluntarily quit, "the act requires that the reason for the unemployment be external and apart from the claimant." *Safeco*, at 392.

In the present case, the Commissioner found that the claimants "voluntarily effected the termination of [their] employment, so that the case[s] [were] properly adjudicated pursuant to RCW 50.20.050." The facts on record support that conclusion. No evidence indicates that Tacoma News "discharged" the claimants and, thus, RCW

50.20.060 has no bearing upon the outcome. Moreover, the claimants' reliance upon *Morillo* is misplaced. In that case, the employer announced that it would be laying off 12 employees. Morillo, a machine operator who could have continued working for the employer, volunteered to be one of the 12 to be laid off because he believed the machines were unsafe. *Morillo*, at 412. Morillo's initial claim for unemployment benefits was denied, although on review the court found he was entitled to benefits. In its reasoning, the court determined that, with regard to the employer's contribution to the unemployment fund, it was immaterial which employee was laid off because the employer would be charged the same amount. *Morillo*, 477 N.E.2d at 413. That court also concluded that because the employer had taken "the first and last step" in bringing about Morillo's unemployment by announcing its intention to lay off 12 people and by later accepting Morillo's offer, Morillo had not "voluntarily" elected to discontinue work. *Morillo*, 477 N.E.2d at 413.

■ Here, however, the claimants did not volunteer to be laid off. Instead, they elected to participate in a voluntary early retirement plan offering them either a lump sum payment or monthly payments over a 3-year period. In addition, the Commissioner found that Tacoma News made "no such announcement or decision" as that made in *Morillo* that 12 employees would in fact be laid off. Instead, the company published an article that made the much broader statement that the company would reduce its total work force "by about 25 positions through a combination of attrition, early retirement and job eliminations."

■ In the same article, Tacoma News also informed its employees that any layoffs that might occur would be based upon seniority and performance ratings. All three claimants had seniority in the company and the record indicates that their job performance had been satisfactory. Each claimant testified that he sought the early retirement option in order to avoid the possibility of being laid

off in the future. However, the claimants' unsubstantiated apprehension of being laid off is not objective evidence that they were actually at risk of being laid off.[6] The record simply does not support a conclusion that the claimants could reasonably believe they would be laid off. Instead, the claimants themselves chose to apply for early retirement (*i.e.*, took the "first step" as discussed in *Morillo v. Director of Div. of Empl. Sec.*, 394 Mass. 765, 477 N.E.2d 412 (1985)) with no compulsion by the company.[7]

Consequently, the claimants voluntarily left their employment in exchange for the early retirement benefit plan, and the Commissioner correctly applied RCW 50.20.050 in concluding that the claimants did not qualify for unemployment benefits.

We next consider whether the three claimants demonstrated that they discontinued working for Tacoma News for "good cause" pursuant to RCW 50.20.050 which would entitle them to unemployment benefits. That statute mandates that when determining whether good cause exists, the Commissioner

> shall only consider work-connected factors such as the degree of risk involved to the individual's health, safety, and morals, the individual's physical fitness for the work, the individual's ability to perform the work, and such other work connected factors as the commissioner may deem pertinent, including state and national emergencies. Good cause shall not be established for voluntarily leaving work because of its

---

[6]On the contrary, Read had received a satisfactory performance rating shortly before he applied for the early retirement option, and the supervisors for all three claimants testified (albeit after the fact) that none of them had been at risk of being laid off.

[7]During oral argument, the claimants' counsel said that before electing early retirement, the claimants asked their supervisors if they were at risk of being laid off and the supervisors could not tell them that information. However, counsel's references to the record do not support that assertion. They merely indicate (1) that a supervisor acknowledged that employees who opted for the early retirement might be taking a "gamble" that they would be laid off if they continued working, and (2) that Christensen believed his supervisor talked other employees out of accepting the retirement offer but did not speak to him about it.

distance from an individual's residence where the distance was known to the individual at the time he or she accepted the employment and where, in the judgment of the department, the distance is customarily traveled by workers in the individual's job classification and labor market, nor because of any other significant work factor which was generally known and present at the time he or she accepted employment, unless the related circumstances have so changed as to amount to a substantial involuntary deterioration of the work factor or unless the commissioner determines that other related circumstances would work an unreasonable hardship on the individual were he or she required to continue in the employment.

RCW 50.20.050(3). Moreover, good cause is to be determined in accordance with the following regulations:

**Interpretative regulations — Disqualification for leaving work voluntarily — Meaning of good cause — RCW 50.20.050 (1) and (3).** (1) General rule. Except as provided in WAC 192-16-011 and 192-16-013, in order for an individual to establish good cause within the meaning of RCW 50.20.050(1) for leaving work voluntarily it must be satisfactorily demonstrated:

(a) That he or she left work primarily because of a work connected factor(s); and

(b) That said work connected factor(s) was (were) of such a compelling nature as to cause a reasonably prudent person to leave his or her employment; and

(c) That he or she first exhausted all reasonable alternatives prior to termination: *Provided,* That the individual asserting "good cause" may establish in certain instances that pursuit of the otherwise reasonable alternatives would have been a futile act, thereby excusing the failure to exhaust such reasonable alternatives.

(2) Exceptions. Notwithstanding the provisions of subsection (1) above, neither the distance of the work from the individual's residence, if known at the time of hire nor any other work factor which was generally known and present at the time of hire will provide good cause for voluntarily leaving work unless the individual demonstrates to the satisfaction of the department:

. . . .

(b) That the related work connected circumstances have so changed as to amount to a substantial involuntary deterioration of the work factor; or

(c) That other work related circumstances would work an unreasonable hardship on the individual if he or she were required to continue in the employment.

. . . .

[(3)](e) "Substantial involuntary deterioration" means an actual and considerable worsening of the work factor outside the control of the individual; and

(f) "Unreasonable hardship" means a result, not due to the individual's voluntary action, that would cause a reasonable person to leave that employment.

WAC 192-16-009(1), (2)(b), (c), (3)(e), (f).

The claimants assert that "substantial involuntary deterioration" of their working conditions had occurred which created the requisite good cause for leaving under RCW 50.20.050.

Read testified that the work he did came to involve heavy lifting of stacks of Sunday newspapers that hurt his arms and back. He spoke with his supervisor, however, and his work schedule was changed so he wouldn't have to work on Sundays. Although a knee problem bothered him at work, he never informed his supervisor that he could not work because of it.

██ In addition, both Read and Frederick claim that substantial involuntary deterioration of their working conditions occurred because the mailers' union was no longer recognized by the new owners of Tacoma News[8] and the variable day and night shifts which were undesirable compared to their former routine day shifts. Frederick also decided to retire early for "fear of being laid off somewhere down the line" and because he felt that "the job was getting harder all the time" and "standing on the cement floor for seven hours at one time was really getting to [him]." Christensen elected to retire early because he felt he "wasn't going to be there too long" and was "convinced [that it was] best to move on."

None of the reasons cited by the claimants, however, amounts to a substantial involuntary deterioration as defined by WAC 192-16-009(3)(e), in stark contrast to *Murphy v. Department of Empl. Sec.*, 47 Wn. App. 252,

---

[8]In 1986 Tacoma Publishing Company was sold to McClatchy Newspapers, Inc. Upon taking over, McClatchy refused to recognize the mailers' local union or the "lifetime employment guarantees" for the mailers as previously negotiated between the union and Tacoma Publishing.

734 P.2d 924 (1987). In *Murphy*, the court found that the employee quit for good cause under RCW 50.20.050 because six distinct conditions demonstrated a "substantial involuntary deterioration of the work factor": (1) the employee had been asked to accept a position as an unskilled laborer (a carbon setter) after working with the company as a brickmason for 17 years; (2) the new job involved extreme heat and danger; (3) the new job was "extremely strenuous" and involved the extended use of a heavy crowbar; (4) very few carbon setters were the employee's age (50) or older; (5) the employee would have a 5 percent reduction in pay; and (6) the employee would have to have begun the new job immediately. *Murphy*, at 259. Such drastic changes are not present in this case.

Further, the claimants failed to exhaust all reasonable alternatives to terminating their employment, as required by WAC 192-16-009(1)(c). For example, Frederick testified that although he was aware of it, he had not attempted to use the employer's formal grievance procedure throughout the 2 years he worked under the conditions he disliked. Although Read had been able to change his schedule to avoid Sunday shifts, neither Read nor Christensen made any attempts to resolve any other concerns they had about their working conditions. The facts do not support a finding that a substantial involuntary deterioration of their work environments had occurred that amounted to a showing of good cause for purposes of RCW 50.20.050. Hence, the Commissioner correctly determined that all three claimants voluntarily left their employment without good cause and were disqualified from collecting unemployment benefits pursuant to RCW 50.20.050.

The decision of the Superior Court is affirmed.

PEKELIS and BAKER, JJ., concur.