901 P.2d 1242

**Rosemary RICE, Appellant,**

v.

**ARIZONA DEPARTMENT OF
ECONOMIC SECURITY,**

and

**American Express Travel–Related
Services, Appellees.**

**No. 1 CA–UB 94–0074.**

Court of Appeals of Arizona,
Division One, Department A.

Aug. 29, 1995.

Arizona State University Law School Clinic by Catherine O'Grady, Patricia L. Carpenter, Brian A. Cabianca, (Students), Tempe, for appellant.

Grant Woods, Atty. Gen. by Daniel W. Pozefsky, Asst. Atty. Gen., Phoenix, for appellee DES.

Snell & Wilmer by William P. Allen, Phoenix, for appellee American Express Travel-Related Services.

## OPINION

WEISBERG, Judge.

Rosemary Rice appeals from the Arizona Department of Economic Security ("DES") Appeals Board's ("the Board") denial of unemployment insurance benefits. Because we conclude that the Board misconstrued Arizona Administrative Code ("A.A.C.") R6-3-50135(H), we reverse and remand for an award of benefits.

### FACTUAL AND PROCEDURAL BACKGROUND

Rice was employed by American Express Travel-Related Services Co., Inc. ("American Express") in Phoenix. On October 26, 1992, American Express announced a voluntary employee retirement program (the "VERP") for employees age fifty-five or older. The program was offered "in conjunction with ... re-engineering efforts and organizational changes."

On October 27, 1992, American Express announced a plan to eliminate 4,800 jobs worldwide through layoffs, attrition, and early retirement. American Express did not specify whether jobs in Arizona would be eliminated pursuant to this plan.

On October 29, 1992, Rice received a letter from American Express seeking volunteers for the VERP. The letter emphasized that the VERP was "a *one time opportunity*" that would be available only until December 15, 1992. (Emphasis in original.) Rice ac-

cepted the voluntary retirement option on November 2, 1992, effective January 1, 1993. Prior to her retirement, American Express still had not specified whether any layoffs would occur in Arizona.

Rice subsequently applied for unemployment benefits from DES. The Deputy granted benefits and the Appeals Tribunal affirmed, reasoning that Rice had volunteered for a layoff, entitling her to benefits pursuant to A.A.C. R6–3–50135(H)(1). American Express then petitioned for review to the Board, which set aside the Appeals Tribunal's decision. The Board affirmed its decision on review, reasoning that Rice was disqualified from benefits under A.A.C. R6–3–50135(H)(2) because American Express had not specifically announced any layoffs of its Arizona employees.

Rice timely appealed the decision of the Board. We have jurisdiction pursuant to Ariz.Rev.Stat.Ann. ("A.R.S.") section 41–1993.

## STANDARD OF REVIEW

 This court must accept the Board's factual findings unless they are arbitrary, capricious, or an abuse of discretion. *Avila v. Arizona Dep't of Economic Sec.,* 160 Ariz. 246, 248, 772 P.2d 600, 602 (App.1989). We will affirm the decision of the Board if it is supported by substantial evidence in the record. *Id.* The Board's legal conclusions, however, are not binding on this court, and we review *de novo* whether the Board properly interpreted the law. *Murray v. Arizona Dep't of Economic Sec.,* 173 Ariz. 521, 522, 844 P.2d 1171, 1172 (App.1992); *Munguia v. Arizona Dep't of Economic Sec.,* 159 Ariz. 157, 159, 765 P.2d 559, 561 (App.1988).

## DISCUSSION

 The Board analyzed Rice's claim under A.A.C. R6–3–50135(H), which reads:

Volunteering for layoff. When an individual volunteers or submits his name to be considered for a layoff or furlough due to a reduction in the work force, a decision must be made as to who initiated the action.

1. When an employer determines that a layoff is to occur and then inquires as to whether there are individuals who will volunteer for the layoff, the separation is a discharge for nondisqualifying reasons.
2. When an employee requests or volunteers for layoff status prior to any specific announcement by the employer and the employer acts upon the request, the separation is a voluntary leaving which is disqualifying unless it can be established that the leaving was for compelling personal reasons.

Under this regulation, the critical question is who initiated the separation from employment: the employee or the employer. *AT & T Information Sys., Inc. v. Arizona Dep't of Economic Sec.,* 154 Ariz. 236, 238, 741 P.2d 703, 705 (App.1987); *see also Murray,* 173 Ariz. at 523, 844 P.2d at 1173. If the employee volunteers before a specific layoff announcement, then the employee has initiated the action and is not entitled to benefits. *See Murray,* 173 Ariz. at 523, 844 P.2d at 1173. On the other hand, if the employee volunteers for a layoff after the employer has 1) determined that a layoff will occur, and 2) inquired whether there are volunteers, then the employer has initiated the action and the employee is entitled to benefits. *AT & T,* 154 Ariz. at 238, 741 P.2d at 705. This is true even when the volunteering employee is not personally "at risk" under the employer's layoff plan. *Id.*

 American Express contends that the instant case is analogous to *Murray.* In *Murray,* Digital Equipment Corporation ("Digital") decided to reduce its work force nationwide. Digital informed its employees that there would be a reorganization that could result in reduced pay, restricted opportunities for future pay increases, and the elimination of positions. It assured its employees, though, that there would be no layoffs. Digital encouraged its employees to leave voluntarily by offering a lucrative retirement program. A Digital employee accepted the retirement program and then sought unemployment insurance benefits pursuant to A.A.C. R6–3–50135(H). On appeal from the Board's denial of benefits, we

held that A.A.C. R6–3–50135(H)(1) was inapplicable because Digital had not announced a layoff and had, in fact, expressly assured its employees that no layoffs would occur. *Murray*, 173 Ariz. at 523, 844 P.2d at 1173.

Rice argues, however, and we agree, that this case is more akin to *AT & T*. When AT & T decided to eliminate 24,000 jobs nationwide, it announced that 29 of the 94 jobs in its Tucson office would be eliminated, and that the 29 employees with the least seniority were "at risk" of involuntary termination. Despite its identification of the 29 "at risk" employees, AT & T gave all 94 employees the option of accepting a "Voluntary Income Protection Program" (the "VIPP"), which was effectively an early retirement program. If a senior employee accepted the VIPP, the number of "at risk" employees would be correspondingly reduced. This court concluded that all employees who accepted the VIPP, even those who were not "at risk" of being laid off, were entitled to benefits under A.A.C. R6–3–50135(H)(1) because AT & T had initiated the action by both announcing layoffs and seeking volunteers for early retirement. *AT & T*, 154 Ariz. at 238, 741 P.2d at 705.

In the instant case, American Express announced a plan to eliminate 4,800 jobs worldwide through layoffs, early retirement and attrition.[1] It then mailed its VERP proposal to all eligible employees, including those in Arizona, making available an early retirement program that was offered as part of its "reengineering efforts and organizational changes." While an American Express representative testified that the layoffs, early retirements and attrition were three separate programs, they were all announced as part of its work force reduction effort, just as they were in *AT & T*.

Attempting to distinguish *AT & T*, American Express first argues that A.A.C. R6–3–50135(H) does not apply here because Rice volunteered for early retirement rather than for a layoff. Aside from the label attached to its VERP option, however, American Express offers nothing to support its argument.

In fact, American Express' VERP is very similar to the VIPP offered by *AT & T*. Under both programs, employees volunteered for permanent separation from employment in exchange for benefits. *See id.* at 236–37, 741 P.2d at 703–04. It was, therefore, to the same type of early retirement program that this court in *AT & T* applied the layoff provisions of A.A.C. R6–3–50135(H). We see no reason not to do so here.

In any event, whether an employee volunteers for an "early retirement" or a "layoff," the benefit to the employer is the same—a reduction in its work force. An employer's obligations under A.A.C. R6–3–50135(H) do not depend on the name it attaches to its voluntary termination program. Therefore, we conclude that, when a voluntary discharge program is offered as an alternative to an involuntary layoff plan, A.A.C. R6–3–50135(H) applies regardless how the program is titled.

American Express next argues that *AT & T* is distinguishable because, in the instant case, "layoffs were [merely] 'in the wind' but not *fait accompli.*" That, however, was equally true in *AT & T*. Had a sufficient number of employees accepted its VIPP, AT & T would not have laid off any of its Tucson employees. In fact, the claimants in *AT & T* actually knew they would not be laid off, but accepted the VIPP anyway. By contrast, Rice had no assurance that she would not be laid off pursuant to American Express' work reduction program. The reasons for applying A.A.C. R6–3–50135(H)(1), therefore, are even stronger in the instant case than they were in *AT & T*.

American Express also argues that *AT & T* is distinguishable because AT & T had announced the specific provisions of how its layoff plan would affect its Arizona employees, while American Express did not. The Board accepted this argument when it found that:

> [W]hile there was evidence [American Express] had determined to eliminate jobs, there was no substantial evidence that

---

1. An American Express representative was quoted in a newspaper article, which is part of the record, as stating that the "rough plan" was to eliminate 1,600 jobs at the New York headquarters, 1,600 elsewhere in the United States, and 1,600 in other countries.

[American Express] had determined to eliminate jobs in Arizona.

Unless [American Express] determined that a layoff is to occur among its Arizona work force, a worker who volunteers for layoff status is a voluntary leaving pursuant to Arizona Administrative Code, Section R6-3-50135(H)(2).

We, however, construe A.A.C. R6-3-50135(H) differently.

■ While we ordinarily give some deference to an administrative agency's interpretation of its own regulations, we generally do so only when that interpretation is long-standing and has been acquiesced in for a long period of time. *See Industrial Comm'n v. Harbor Ins. Co.*, 104 Ariz. 73, 76, 449 P.2d 1, 4 (1968); *Marlar v. State*, 136 Ariz. 404, 411, 666 P.2d 504, 511 (App.1983). In the instant case, there is no indication that either the Board or DES has ever construed A.A.C. R6-3-50135(H) in this manner prior to the decision here. In any event, "the ultimate responsibility for interpreting a statute or regulation rests with the courts." *Marlar*, 136 Ariz. at 411, 666 P.2d at 511.

■ The principles of statutory construction apply with equal force to the construction of regulations promulgated by an administrative body. *Id.* at 410, 666 P.2d at 510. In addition, when interpreting administrative regulations promulgated under the Employment Security Act (the "Act"),[2] courts must be mindful that this legislation was designed to be "ameliatory of the evils resulting from lack of employment." *Southwest Lumber Mills, Inc. v. Employment Sec. Comm'n*, 66 Ariz. 1, 5, 182 P.2d 83, 85 (1947); *see also Munguia*, 159 Ariz. at 161–62, 765 P.2d at 563–64. Because the Act is remedial, the regulations promulgated thereunder are to be liberally construed in favor of granting benefits. *Southwest Lumber Mills*, 66 Ariz. at 5, 182 P.2d at 85; *Munguia*, 159 Ariz. at 161–62, 765 P.2d at 563–64; *AT & T*, 154 Ariz. at 237, 741 P.2d at 704.

The Board's interpretation of A.A.C. R6-3-50135(H), requiring the employer to announce a specific plan to terminate *Arizona* employees, is not supported by the language of the regulation. The regulation merely requires that the employer "determine[ ] that a layoff is to occur and then inquire[ ] as to whether there are individuals who will volunteer for the layoff." Nowhere does the regulation suggest that the employer's plan must *necessarily* eliminate jobs in Arizona.

When American Express announced its plan to eliminate 4,800 jobs worldwide, it did not exempt its Arizona employees. The company gave no indication where these cuts would occur. It was reasonable for Rice to be concerned that some of these layoffs could occur in Arizona. In addition, Rice was merely told of the impending worldwide layoffs, and then given but a few weeks to decide her course of action. Her job uncertainties thus exceeded those of the *AT & T* claimants. We therefore conclude that the Act's underlying policy of social stability would be better served by providing benefits to Arizona employees in Rice's position. *See AT & T*, 154 Ariz. at 237, 741 P.2d at 704 ("The policy underlying unemployment insurance is to achieve social stability by reducing the economic burden placed on those unemployed through no fault of their own.").

## CONCLUSION

We hold that the Board erred in construing A.A.C. R6-3-50135(H) to require an announcement of layoffs specifically targeted toward Arizona employees. We therefore reverse the Board's decision and remand for an award of benefits.

GARBARINO and GERBER, JJ., concur.

2. A.R.S. §§ 23–601 through 23–799.