[Nos. 16407-1-III; 16408-0-III; 16409-8-III. Division Three. November 5, 1998.]

ERIK H. NIELSEN, ET AL., *Appellants*, v. THE EMPLOYMENT SECURITY DEPARTMENT, ET AL., *Respondents*.

22

*William B. Knowles* and *Matthew J. Bean*, for appellants.
*Christine O. Gregoire, Attorney General*, and *Derek L.*

24

*Edwards, Assistant*; and *Michael J. Killeen* and *Harry J.F. Korrell III* of *Davis Wright Tremaine*, for respondents.

SWEENEY, J. — This is the consolidation of three appeals[1] filed by Westinghouse Hanford Company workers who participated in an employer-sponsored Special Voluntary Reduction of Force program (SVROF), after Westinghouse announced 4,800 jobs would be eliminated at the Hanford Nuclear Reservation. Westinghouse offered the SVROF to satisfy a United States Department of Energy (DOE) mandated reduction in force. All of these claimants were denied unemployment compensation benefits because their participation in the SVROF was deemed a disqualifying voluntary quit under RCW 50.20.050. The question here is whether they "left work voluntarily without good cause" when they accepted the SVROF. We conclude that the Westinghouse SVROF fell within the Employment Security Department's employer-initiated reduction-in-force exception to RCW 50.20.050, and that quits under such a program are not "voluntary." WAC 192-16-070.

FACTS

The National Defense Authorization Act of 1993, 42 U.S.C. § 7274h, authorized the DOE, in consultation with the responsible contractors, to develop a work force restructuring plan for operation of the DOE's Hanford Nuclear Reservation. In response, Westinghouse, the primary

---

[1]All three cases involve identical issues of law and we therefore consolidate them for purposes of this opinion. RAP 3.3(b).

contractor, developed a three-phase plan to eliminate 4,800 jobs:

Phase I (December 1994)—an early retirement program;

Phase II (January 1995)—the first SVROF;

Phase III (April 1995)—the second round of SVROF and involuntary layoffs.

A third round of SVROF was implemented in January 1996. DOE approved the plan.

The SVROF offered employees several severance packages, including cash payouts based on length of service, relocation costs, and educational stipends. Westinghouse retained the right to select which employees would be accepted for SVROF.

John Wagoner, DOE's site manager, announced the second phase of the restructuring plan, the SVROF, on January 18, 1995:

We have today received approval from DOE Headquarters to begin the second phase of the program designed to reduce the Hanford work force to a level compatible with Fiscal Year 1995 budget authorizations. Therefore I am today authorizing the Hanford contractors to begin a voluntary separation program under which selected categories of contractor employees may volunteer to be separated from the rolls in exchange for an incentive package.

We anticipate that about 500 employees sitewide will take advantage of this offer . . . . The bulk of the separations will come from Westinghouse Hanford Company and its subcontractors . . . .

Each contractor is notifying its employees in sitewide messages later today of which categories of employees are being offered the voluntary separation program and details of the program itself.

. . . .

This is the second phase of a program designed to reduce the Hanford work force by up to 2,500 employees to meet the

FY 1995 budget levels. During the first phase completed in December, 843 of your colleagues took a voluntary early retirement program. *The next phase, an involuntary separation program, is expected to begin shortly* after the completion of the voluntary separation program . . . .

. . . .

. . . We appreciate the cooperation of the contractors and you, the Hanford staff members, in reducing the size of our staffs to meet budget limitations and our needs.

Rasp Commissioner's Record at 61-62 (emphasis added).

On the same day, LaMar Trego, Westinghouse's president, made the following announcement:

It is with mixed emotions that I announce that . . . we were given DOE approval to offer a Special Voluntary Reduction of Force (SVROF) to Westinghouse Hanford, BCS Richland and ICF Kaiser Hanford employees.

. . . .

Based on a thorough staffing and skills mix analysis, we have determined which specific job categories we must cut back on, and how many of those jobs we can eliminate . . . .

*Every volunteer will reduce the number of employees that might otherwise be laid off involuntarily.* Of course, I cannot guarantee that there will be no involuntary layoffs; nor should you infer that you are exempted from future involuntary reductions or transfers to other departments if your current job category is not one of those being targeted for reduction.

The general provisions of the SVROF and request forms will be provided in a separate message to follow later today . . . .

Requests to participate in the program can be submitted starting Monday, January 23, through Tuesday, January 31, on a first-come, first-served basis. If you think you might want to take advantage of this program, please carefully weigh all of your options so that the decisions you make about your future will be the best for you.

Rasp Commissioner's Record at 63-64 (emphasis added).

Erik H. Neilsen,[2] a senior engineer, started at Westinghouse in July 1989. The number of workers in his department was reduced from 20 to about 18 in the first two rounds of layoffs. Mr. Neilsen took part in the third and final round of the SVROF, which was announced in January 1996. Westinghouse approved his application and authorized his release. His last day of work was February 9, 1996. After Mr. Neilsen left, his position was eliminated. Neilsen Commissioner's Record at 31.

He applied for unemployment benefits in April 1996. Benefits were denied, on the ground he had quit voluntarily without good cause because the employer had not announced an *involuntary* reduction-in-force pursuant to WAC 192-16-070(1). Neilsen Commissioner's Record at 43. The denial was upheld by both the Administrative Law Judge (ALJ) and the Commissioner's Delegate.

Sharon A. Rasp started at Hanford in 1989. From April 1993 to April 1994, she supervised 15 to 17 employees as manager of public affairs. In April 1994, her position was eliminated, and she accepted temporary "special assignment" as a staff manager at the same rate of pay but with no supervisory duties. Her primary job was drafting communications to employees about the impending reduction-in-force. She perceived her new position as temporary and a loss of status.

Ms. Rasp applied for the January 1995 SVROF, opting for a cash payout based on length of service. At Westinghouse's request she extended her service twice, finally leaving on May 31, 1995, after the second SVROF and involuntary layoffs had commenced. Her total severance package equaled what she would have received had she been involuntarily terminated.

Ms. Rasp filed for unemployment benefits a year later, on March 27, 1996. The Tri-Cities Job Service Center also denied her benefits concluding that WAC 192-16-070 was inapplicable. The ALJ reversed, finding Ms. Rasp had good

---

[2]We note from the Commissioner's Record in Neilsen that this is the correct spelling of his name.

cause for a voluntary quit under RCW 50.20.050 independently of the WAC, because her position was eliminated, many of her responsibilities taken away, and her job security uncertain. The Commissioner's Delegate reversed the ALJ, concluding the quit was voluntary.

Janet K. Becker started with Westinghouse in March 1989. When she left, she was an administrative assistant with the Quality Assurance Central Support Group. She became concerned about her prospects with Westinghouse when she saw a proposed organization chart of her work group, which would cut it from 157 employees to 12 and eliminate her position. The organization chart was not final. But Ms. Becker was told by her team leader, who prepared the budget information for the manager, that her hours would be reduced to part time as soon as a new budget was authorized, probably within two weeks. Ms. Becker's job was eliminated.

Ms. Becker did not ask the manager of Quality Assurance about the chart, the reduction in hours, or the prospects for continued employment in another department. She believed the team leader would get into trouble for giving her this information. Westinghouse took the position that reassignment within the company was available, and that nobody in Quality Assurance was involuntarily terminated.

Ms. Becker inferred from the proposed organization chart and her lack of an advanced degree that her termination was inevitable. She applied for the final SVROF in January 1996. Her application was approved. She took the $15,000 cash payout and left on February 9, 1996.

Ms. Becker applied for unemployment benefits on February 14, 1996. The Tri-Cities Job Service Center denied eligibility for voluntarily quitting without good cause because Westinghouse did not announce an involuntary reduction-in-force. This determination was upheld by both the ALJ and the Commissioner.

All three employees timely appealed the denial of

benefits. And the Benton County Superior Court certified the cases to this court.

## DISCUSSION

We first review the issue common to all three appeals— whether the Employment Security Department Commissioner correctly characterized the unemployment of these claimants as voluntary and without cause.

A. Standard of Review. Our review is governed by RCW 34.05, the Administrative Procedure Act (APA). We review the findings and decision of the commissioner, not the underlying ALJ order. RCW 34.05.464(4); *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 405-06, 858 P.2d 494 (1993). The commissioner's decision is a conclusion of law reviewed de novo. *Safeco Ins. Co. v. Meyering*, 102 Wn.2d 385, 390, 687 P.2d 195 (1984). While we give deference to the agency's interpretation of its own regulations, this court has the ultimate responsibility to see the rules are applied consistently with the policy underlying the statute. *Id.* at 392.

B. Statute To Be Liberally Construed. The Employment Security Act is a highly remedial statute that must be "liberally construed for the purpose of reducing involuntary unemployment and the suffering caused thereby to the minimum." RCW 50.01.010; *Shoreline Community College Dist. No. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 406, 842 P.2d 938 (1992).

C. RCW 50.20.050. *"An individual shall be disqualified from benefits beginning with the first day of the calendar week in which he or she has left work voluntarily without good cause . . . ."* RCW 50.20.050(1) (emphasis added). The question of whether these claimants left Westinghouse voluntarily and without cause is at the heart of this appeal. The phrase "left work voluntarily" "expresses a clear legislative intent that to disqualify a claimant from benefits the evidence must establish that the claimant, by his or her own choice, intentionally, of his or her own free will,

terminated the employment." *Vergeyle v. Employment Sec. Dep't*, 28 Wn. App. 399, 402, 623 P.2d 736, *review denied*, 95 Wn.2d 1021 (1981), *overruled on other grounds by Davis v. Employment Sec. Dep't*, 108 Wn.2d 272, 276, 737 P.2d 1262 (1987).

D. WAC 192-16-070. In 1993, the Department promulgated WAC 192-16-070:

> A layoff or reduction-in-force will not be considered to be a voluntary quit pursuant to RCW 50.20.050, if:
>
> (1) The *employer announced a layoff or reduction-in-force*; and
>
> (2) The *claimant volunteered* to be one of the people included in the *layoff* or *reduction-in-force*; and
>
> (3) The *employer determines* which *individuals* are *laid off* or *released* through a reduction-in-force; and
>
> (4) The *employer* accordingly *laid off* or *released* the *claimant due to a reduction-in-force.*

(Emphasis added.) It is the Department's interpretation of this regulation that we are asked to review.

We apply general principles of statutory construction to administrative regulations, particularly where, as here, they are adopted pursuant to express legislative authority. *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979); *Hayes v. Yount*, 87 Wn.2d 280, 552 P.2d 1038 (1976). We may consider the history of the regulation in determining its meaning. *Cherry v. Municipality of Metro. Seattle*, 116 Wn.2d 794, 799, 808 P.2d 746 (1991).

The Employment Security Department bulletin announcing WAC 192-16-070 set out the Department's purpose in promulgating the rule:

> SUBJECT: EMPLOYER-INITIATED VOLUNTARY JOB SEPARATIONS.
>
> . . . .
>
> Background: The department has long held that unemployment insurance benefits are payable to individuals who are in-

voluntarily unemployed. Frequently employers work with labor to offer reduction-in-force options other than the traditional seniority-based layoff system. These options help to ease the layoff for those affected.

What's New: The agency adopted a new permanent section to Chapter 192-16 WAC which allows claimants to voluntarily participate in employer-initiated reductions-in-force.

Contracts & Rules Office, Wash. Employment Sec. Dep't, Rulemaking File Re: WAC 192-16-070 [hereinafter Rulemaking File], UI Circular 6-93, Supp. I, at 1 (Oct. 21, 1993).

The Department also distributed a form described as:

## AGENCY'S CONCISE EXPLANATORY STATEMENT OF:
## I. REASONS FOR ADOPTING RULE.

A. Changes in Washington State's economy and workforce needs prompted the Employment Security Department to re-examine its policy and rules on employees who volunteer to be laid off when an employer has announced a reduction-in-force. Based upon internal and public input, rules were adopted to extend Unemployment Insurance benefits to claimants who are separated as a result of employer initiated reductions in force. The rule will benefit employers by adding another tool which can be used to ease the pain of downsizing, while minimizing the negative impact to affected workers by reducing the risk of a denial of unemployment insurance for volunteering for lay-off.

Rulemaking File, Agency's Concise Explanatory Statement of Reasons for Adopting Rule (1993).

The Department's reasons behind this rule were also spelled out in its notice of "Proposed Rule Making." Among other things, the notice gave the following explanation:

(a) Title of Rule: (Describe Subject)

Voluntary Layoffs.

Purpose:

To adopt a permanent new section to WAC 192-12, to

clarify policy in adjudication where an individual volunteers to be laid off as part of a company reduction-in-force.

. . . .

(c) Summary:  The department is proposing a new section be added to WAC 192-12 to provide an interpretive regulation to define that individuals who voluntarily offer to be laid off when an employer is anticipating a reduction in force to not have their separation from employment considered to be a voluntary quit.

Reasons supporting proposal:

The department desires to provide uniformity in adjudication in a large number of expected cases which do not fit existing precedents and policies.

. . . .

(j) Short explanation of rule, it's purpose, and anticipated effects:

To clarify policy in adjudication where an individual volunteers to be laid off as part of a company reduction-in-force. Current policy does not allow for an individual to be considered eligible for unemployment compensation benefits if their last separation is considered to be a voluntary layoff. In light of a number of companies considering mass layoffs due to the current economic situation, the department is adopting a rule to allow an individual to volunteer to be laid off if the employer is considering a layoff or reduction-in-force.

Rulemaking File, Proposed Rule Making (a) Voluntary Layoffs (1993).

Our reading of both the regulation itself and the Department's own explanation of the purpose for that regulation

leads us, inescapably, to the conclusion that the Department intended to include participation in precisely such reductions-in-force, as those instituted at Hanford, within its existing list of "work-connected factors" qualifying "voluntary quits" for good cause under RCW 50.20.050. And WAC 192-16-070 effectively does so.

The Department and Westinghouse now contend that these claimants must show that they volunteered to substitute themselves for individuals facing immediate involuntary layoff, thus allowing specific designated employees to avoid layoff. Westinghouse Br. at 27. They attempt to distinguish such an "involuntary" reduction-in-force from the "voluntary" reduction-in-force under the Westinghouse plan, and to limit the application of WAC 192-16--070 to the former. Westinghouse Br. at 27. While this construction is certainly plausible and, as we shall see, has been accepted by Division One, we reject it as inconsistent with the Department's interpretation of the statutory framework. *Anderson, Leech & Morse, Inc. v. Washington State Liquor Control Bd.*, 89 Wn.2d 688, 694, 575 P.2d 221 (1978). We believe the construction is narrow and contrary to our charge to liberally construe the Employment Security Act to afford benefits.

The clear language of the regulation brings its provisions into effect when the "employer announces a reduction-in-force." The word "involuntary" does not appear. WAC 192--16-070(1). The Department argues that the omission of the word "involuntary" was a mistake.

It is helpful to review a short list of relevant cases from Washington and other jurisdictions.

E. Washington Case Law. All parties discuss the same three Washington cases. The earliest, *Read v. Employment Sec. Dep't*, 62 Wn. App. 227, 813 P.2d 1262 (1991), is probably the most significant since, although it predates WAC 192-16-070, it set the analytical framework for future RCW 50.20.050 early retirement cases.

*Read* is a consolidation of the appeals of Jack Read, James Christensen and Earl Frederick, employees of the

Tacoma News. The employer implemented an early retirement plan for qualified employees. *Read*, 62 Wn. App. at 228-29. The program was completely voluntary. Although no layoffs were threatened, the employer later announced that "[w]hen all the dust clears, we will have reduced our total work force by about 25 positions through a combination of attrition, early retirement and job eliminations. We have more than 750 full- and part-time employees." *Id.* at 229. The program included a severance package.

Read's application was accepted, even though he was six months shy of the minimum early retirement age. Frederick applied because he felt his job, which required him to stand on a cement floor for seven-hour shifts, was "getting harder all the time." *Id.* at 230. Read and Christensen were first granted benefits; Frederick was denied benefits at the outset. *Id.* at 230-31. The ALJ reversed the awards to Read and Christensen and affirmed the denial of benefits to Frederick. The commissioner affirmed. The ALJ found, among other things, " '[t]here were no plans by the employer to lay off [Read] or discharge him for any reason.' " *Id.* at 230. The ALJ made similar findings about Frederick and Christensen:

- Frederick—" '[b]ut for [the voluntary retirement] package [Frederick] would not have resigned at the time he did despite other reasons he advanced for doing so.' . . . Frederick's job was 'relatively safe and . . . thus if he had not accepted this resignation retirement package, he would not have been discharged or laid off.' " *Id.* at 231.

- Christensen—"Christensen 'would not have voluntarily quit except for the [volunteer retirement] program.' . . . [And] the 'evidence fail[ed] to establish that the claimant was in imminent danger of involuntary termination had he not volunteered to quit under the [volunteer retirement] program.' " *Id.*

These were adjudicated voluntary quits by employees whose positions were, according to the findings, relatively secure and with an employer who had not threatened layoffs. *Id.* at 234-35.

*Anheuser Busch, Inc. v. Goewert*, 82 Wn. App. 753, 919 P.2d 106 (1996), *review denied*, 131 Wn.2d 1005 (1997) held that early retirement, even after a 10 percent reduction-in-force announcement, did not fall under the exception to RCW 50.20.050 created by WAC 192-16-070 and constituted a voluntary quit without cause.

In *Goewert*, Anheuser Busch announced its intention to reduce salaried administrative staff by 10 percent. To do this, it offered an early retirement program. Goewert asked for reassurances that his job would not be terminated before the deadline set by Anheuser Busch for accepting the early retirement offer. Because Anheuser Busch refused to answer or reassure him, he accepted the offer before a company-imposed deadline. *Goewert*, 82 Wn. App. at 755-56. Anheuser Busch paid him $197,819.28, and Goewert retired.

The *Goewert* court found "the employer did not announce a layoff or reduction-in-force" and accepted the Commissioner's finding that Goewert would not have been laid off. *Id.* at 759, 756. It concluded that "[b]ecause Anheuser did not announce that it was laying off employees or reducing its work force by terminating employees, WAC 192-16-070" did not apply. *Id.* at 758. The court concluded that Goewert's quit was not under compulsion. *Id.* at 761.

The court rejected Goewert's argument that the proper focus should be on the employer's broader objective of reducing the work force. *Id.* at 760. "The fact that Anheuser purposefully sought to eliminate 10 percent of its employees by offering them early retirement does not transmute that action into involuntary layoffs." *Id.* We disagree with the court's conclusion that "[*w*]*hile Goewert was part of the class targeted for voluntary reductions that could lead to future involuntary reductions, this status is irrelevant since he was under no compulsion to retire at the time of his decision.*" *Id.* at 761 (emphasis added). We will discuss *Ortega* next and then explain why.

Finally, in *Ortega v. Employment Sec. Dep't*, 90 Wn. App. 617, 953 P.2d 827 (1998), the same Westinghouse SVROF

before us was before Division One. On essentially identical facts, the *Ortega* court concluded that its reasoning in *Goewert* applied. *Id.* at 623. In reaching this conclusion, the *Ortega* court accepted the rationale offered by the Department—in order to satisfy the requirements of WAC 192-16-070, the layoff or reduction-in-force program must be in the "mandatory phase." *Id.* at 625. The court reasoned that the exception created by the rule had the limited purpose of providing benefits to those employees who volunteered to be laid off in the place of an individual specifically named for involuntary layoff, because such volunteers would be disqualified for employment benefits under RCW 50.20.050 since they "technically volunteered" to leave their job. *Id.* at 625-26. While WAC 192-16-070 does ensure benefits for these workers, the Department's own statements of the intended scope of the exception are broader.

The *Ortega* court's interpretation effectively adds the term "involuntary" to WAC 192-16-070(1), resulting in a narrow construction of a regulation that disqualifies large numbers of workers, contrary to the overriding mandate of liberal construction. RCW 50.01.010; *Shoreline Community College Dist. No. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 406, 842 P.2d 938 (1992); *Penick v. Employment Sec. Dep't*, 82 Wn. App. 30, 36, 917 P.2d 136, *review denied*, 130 Wn.2d 1004 (1996).

We add language to a statute only where its omission creates a contradiction that renders the statute absurd and undermines its sole purpose. *Department of Labor & Indus. v. Freeman*, 87 Wn. App. 90, 97, 940 P.2d 304 (1997), *review denied*, 134 Wn.2d 1011 (1998). Here, it is the addition, not the omission, which creates contradiction and undermines the remedial purpose of the statute.

From the perspective of the workers, in what sense was the Hanford reduction-in-force not involuntary? Westinghouse announced the elimination of 4,800 jobs. The employees had no voice in promulgating this employer mandate, which was the ultimate cause of all the unemploy-

ment. It was only within the context of this employer mandate that these employees exercised their limited options to elect the manner of their leaving, within the bounds of the three-phase plan imposed on them by Westinghouse. "It should not matter which of several employees are sacrificed, nor does it matter that a claimant participated in the decision. The ultimate choice belonged to the employer, and the ultimate responsibility for the unemployment of each of these claimants lies only with the employer's decision to reduce available jobs." *Missouri Div. of Employment Sec. v. Labor & Indus. Relations Comm'n*, 651 S.W.2d 145, 147 (Mo. 1983). A massive work force reduction put into effect by the employer is necessarily mandatory on the employees from its inception. That any given layoff within that mandatory framework might be of a senior "volunteer" is the premise of WAC 192-16-070, which unambiguously addresses itself to the concerns of these volunteering workers.

Employers in general, and Westinghouse in particular, wield enormous economic control over their employees. For the Commissioner to infer from these facts that these claimants chose of their own will to abandon their jobs, for reasons unrelated to the actions of Westinghouse, is to ignore this economic reality.

Moreover, for these particular claimants, the so-called "mandatory" phase was well under way. Three months after the Phase II SVROF, Phase III, including involuntary layoffs, started. This phase was already under way when Ms. Rasp's Phase II voluntary termination became effective. Rasp Commissioner's Record at 98-99. Mr. Neilsen left in the final round, after involuntary layoffs had occurred. Ms. Becker had information that a reasonably prudent person would heed under the circumstances that her work group was to be decimated and her own position eliminated. To characterize these terminations as "voluntary" in this context is semantic sleight-of-hand that is irreconcilable with our charge to narrowly confine disqualifying exceptions.

To argue, as Westinghouse does here, that these employees voluntarily quit their jobs solely to receive a benefit of, at most, $15,000 is fanciful. These workers participated in the program because Westinghouse mandated that 4,800 employees would be fired in short order if enough of them did not agree to go. This is compulsion. *Cowles Publ'g Co. v. Department of Employment Sec.*, 15 Wn. App. 590, 593, 550 P.2d 712 (1976), *review denied*, 88 Wn.2d 1001 (1977).

Westinghouse had made it clear that massive layoffs were imminent and inescapable. And, in each of these three cases, the worker's specific job category was targeted.

F. Cases from Other Jurisdictions. Our analysis is supported by authority from other jurisdictions analyzing similar statutory provisions. *Shoreline Community College*, 120 Wn.2d at 406.

In *Morillo v. Director of Employment Sec.*, 394 Mass. 765, 477 N.E.2d 412 (1985), heavily relied on in *Read* and *Goewert*, the issue was whether an employee who agreed to be one of those laid off after the employer had announced its decision to lay off 12 employees was ineligible for benefits under a Massachusetts unemployment compensation disqualification for voluntary quit without cause. 477 N.E.2d at 412. The court, noting its mandate to liberally interpret its state statute in favor of granting relief, held that such volunteers were eligible for benefits. *Id.* at 413.

The *Morillo* court reasoned that, when the first and last steps of the termination process are taken by the employer, the termination is not "voluntary" within the meaning of disqualifying provisions of unemployment compensation statutes. *Id.* Other courts agree. *AT&T Info. Sys., Inc. v. Department of Econ. Sec.*, 154 Ariz. 236, 239, 741 P.2d 703 (Ct. App. 1987); *Stanford v. Unemployment Ins. Appeals Bd.*, 147 Cal. App. 3d 98, 195 Cal. Rptr. 1, 3-4 (1983); *South Cent. Bell Tel. Co. v. Department of Labor*, 527 So. 2d 1113, 1116 (La. Ct. App. 1988).

The same reasoning applies here. Under direction by the DOE, following substantial cutbacks in funding, Westinghouse was to eliminate 4,800 jobs. The reductions target

was not theoretical or indefinite. It has been fulfilled. The reduction was initiated by the employer. And the last step in the termination process, like the last step in the termination process of *Morillo*, was taken by the employer, who retained the authority to accept the application and release the employee or reject it.

To seize upon the fact that Morillo volunteered to replace one of 12 individuals slated for immediate layoff as distinct from offering to be one of 4,800 destined for inevitable eventual layoff is, again, incompatible with our mandate of liberal construction. The question is whether the layoff is mandatory in the sense of having been initiated and announced by the employer, not whether a particular individual had been named.

The AT&T case implicated a collective bargaining agreement, but the guiding principles are the same. First, the court noted that "[w]hen an employer announces a layoff, inevitably some employees will lose their jobs." *AT&T*, 741 P.2d at 705. And,

> the instigating cause for the [employee's] termination of employment was the employer's announced mandatory layoff. [Employee's] rights under the collective bargaining agreement to elect a substitutionary layoff did not arise until after the employer had already determined a mandatory layoff would be made. *Then, and only then, did he exercise the limited right, within the bounds of the bargaining agreement, to elect a substitutionary layoff.*

*Id.* at 706 (emphasis added) (quoting *Stanford*, 195 Cal. Rptr. at 3).

Another recent decision from the Arizona Court of Appeals is instructive. The court held that unemployment benefits were payable to an employee who accepted the *early retirement* option of a multi-phase reduction-in-force plan. *Rice v. Department of Econ. Sec.*, 183 Ariz. 199, 901 P.2d 1242 (Ct. App. 1995). The employer, American Express, announced a plan to eliminate 4,800 jobs worldwide. The plan did not specify layoffs in Arizona. *Id.* at 200. Noting

its mandate of liberal construction in favor of providing relief, the court ruled that, because the Arizona regulation granting benefits to volunteers in employer-initiated layoff schemes did not so specify, it was not a requirement that layoffs be specifically planned for Arizona. *Id.* at 203. It was sufficient that the claimant had no assurance that she would *not* be laid off. *Id.* at 202.

Finally, in *South Central Bell*, the question before the court was "whether 'good cause' includes a situation where an employer intends to discharge, or lay off, employees due to a shortage of work, and an employee resigns in lieu of the employer 'bumping' a co-worker with less seniority." *South Cent. Bell*, 527 So. 2d at 1115.

There, the claimant, a senior employee, had the opportunity to voluntarily leave and receive VIP pay. She could have continued to work at the same classification at the same rate of pay, but chose not to do so because she did not want to "bump" a coworker with less seniority. She chose to leave and accept the termination pay because she understood that the coworker would have to pass a typing test, which apparently she could not do. *Id.* at 1114.

The court found the claimant did not leave work voluntarily without cause, because the first and last steps in the termination process were taken by the employer. "The claimant's conduct in volunteering did not terminate his employment because the employer was not compelled to accept the claimant's offer." *Id.* at 1116 (quoting *Morillo*, 477 N.E.2d at 413). The court accepted the rationale of *Morillo* in toto:

> The reasoning of *Morillo* is sound. Had Bell simply terminated the employees with less seniority than Masters, they would have been eligible for benefits (assuming no other disqualification) because their unemployment would have resulted from economic causes. Bell made the initial decision to lay off a certain number of employees due to work shortage or reorganization. Bell merely allowed Masters to choose to be one of those employees laid off.

*South Cent. Bell*, 527 So. 2d at 1116.

None of these cases concerns itself with the "phase" of the reduction-in-force. Volunteering to leave employment following an employer's announcement of layoffs whether in the exercise of a collective bargaining right or in the exercise of rights extended through an SVROF is with good cause.

G. Good Cause. Even were we to conclude that the terminations here were voluntary, we would conclude they were made for good cause.

Whether or not a voluntary termination is with good cause is a legal determination and is reviewed de novo. *Grier v. Department of Employment Sec.*, 43 Wn. App. 92, 95, 715 P.2d 534, *review denied*, 106 Wn.2d 1003 (1986).

The employee must leave primarily because of work-connected factors of such a compelling nature as to cause a reasonably prudent person to leave, after exhausting all reasonable alternatives. WAC 192-16-009(1)(a)-(c).

The Commissioner must consider only work-related factors. RCW 50.20.050; *Wallace v. Employment Sec. Dep't*, 51 Wn. App. 787, 790-91, 755 P.2d 815 (1988). Conditions are work-related if they are not personal, but brought about by the employer. *Terry v. Employment Sec. Dep't*, 82 Wn. App. 745, 751, 919 P.2d 111 (1996). Good cause also requires that the reason for the unemployment be "external and separate from the claimant." *Cowles Publ'g*, 15 Wn. App. at 593. The principle of fault underlies the Employment Security Act; whether the unemployment is involuntary or voluntary, the Act provides for benefits when the fault does not lie with the claimant. *Id.*

In *Cowles*, the court concluded that an employee's dissatisfaction with low wages and the lack of opportunity for promotion was a personal reason and, therefore, the fault lay with the employee. *Id.* at 596. By contrast, in *Matison v. Hutt*, 85 Wn.2d 836, 539 P.2d 852 (1975), an employee who quit rather than lose valuable union benefits was eligible for unemployment benefits because the reason for quitting was not personal but rather reflected

the reality of a working person's life. People earning rather

minimum wages are especially dependent upon current health and welfare coverage and potential pension benefits. That those benefits arose from voluntary membership in a union does not diminish their real and substantial impact upon and importance to these plaintiffs.

*Id.* at 839.

But "[a]n employee need not suffer actual harm to qualify for unemployment compensation after leaving a job; a reasonable apprehension of future harm is sufficient to constitute good cause under the Employment Security Act." *Robinson v. Employment Sec. Dep't,* 84 Wn. App. 774, 778-79, 930 P.2d 926 (1996). In *Robinson,* the court held that an escrow company employee quit for good cause after the State issued a cease and desist order preventing her employer from processing further loans. *Id.* at 776-77. The proper test is what a reasonably prudent person would do in similar circumstances. *Id.* at 778.

The Department itself, from time to time, promulgates regulations to clarify when a voluntary quit falls within the "work-connected factors" exception of RCW 50.20.050. Non-disqualifying exceptions are defined in WAC 192-16--011 (quitting to accept a bona fide job offer) and WAC 192--16-013 (quitting because of illness or disability of worker or immediate family member).

Here, the direct and immediate causes of unemployment were the employer's decisions—first to terminate 4,800 people and finally to terminate these specific individuals. These causes are external to the employees and work-related.

H. Other Issues. Becker: Ms. Becker contends that even if her quit was voluntary under RCW 50.20.050, the organization chart, combined with her lack of advanced credentials, was good cause in these circumstances for her to quit. We agree.

Our holding in *Grier* is dispositive. In *Grier,* the court disagreed with the commissioner's finding that the claimant "precipitously and prematurely" quit after being

informed that her full-time job would be cut to part time. *Grier*, 43 Wn. App. at 96. Ms. Grier quit 10 days before the cut was to take place. The court concluded that she was entitled to unemployment benefits from the time the reduction would have gone into effect. *Id.* at 98-99.

Similarly, it was Ms. Becker's employer's decision to substantially reduce her hours that brought about her separation. As in *Grier*, Ms. Becker is entitled to benefits from the date the hours were cut or her position eliminated.

Rasp: Ms. Rasp claims for the first time on appeal that her termination was a discharge when Westinghouse released her following its extension of her employment on a temporary basis after accepting her application for SVROF. Issues not raised before the agency may not generally be raised on appeal. RCW 34.05.554; *King County v. Boundary Review Bd.*, 122 Wn.2d 648, 668, 860 P.2d 1024 (1993). However, this court has inherent authority to consider all issues necessary to reach a proper decision. *Shoreline Community College Dist. No. 7 v. Employment Sec. Dep't*, 120 Wn.2d 394, 402, 842 P.2d 938 (1992).

In light of our previous discussion, it is a fortiori true that the direct and immediate cause of Ms. Rasp's unemployment was Westinghouse's determination that it was time for her to go. She was discharged for the purposes of the Employment Security Act and is entitled to benefits.

I. Attorney Fees. RCW 50.32.160 provides that if this court overturns or modifies the Commissioner's ruling, the appellants should receive reasonable attorney fees. *Abulhosn v. Employment Sec. Dep't*, 106 Wn.2d 486, 492, 722 P.2d 1306 (1986). We grant these fees subject to timely submission of an affidavit of fees by the prevailing attorneys. RAP 18.1; *Terry*, 82 Wn. App. at 753.

## CONCLUSION

If an employee leaves work voluntarily, she or he is not entitled to unemployment compensation benefits unless the quit is for good cause. RCW 50.20.050. We conclude

that, because the first and last acts in the termination were the employer's, the volunteers for layoff under the Westinghouse SVROF program did not leave work voluntarily and are eligible for benefits pursuant to the exception to RCW 50.20.050 created by WAC 192-16-070.

The first act here was the announcement of impending layoffs. Without that, the claimants here had neither the right nor the incentive to elect to leave. Those layoffs were inevitable and were mandated by the federal government.

The last act was that of the employer accepting the employees' election to leave rather than run the risk of being first involuntarily terminated. They agreed to participate in a program that would ultimately lead to involuntary layoffs. The question was not whether, but when. Westinghouse retained control over who was allowed to participate in the program and, accordingly, who was terminated. WAC 192-16-070(4) allows benefits only to those who are selected for separation by the employer. The regulation therefore properly considers a separation under these circumstances to be a discharge rather than a voluntary quit.

The decisions of the Commissioner are reversed, and the Department is ordered to pay unemployment compensation benefits to Erik H. Neilsen, Janet K. Becker, and Sharon A. Rasp. Attorney fees on appeal are granted. The cases are remanded for determination of reasonable attorney fees.[3]

KURTZ, A.C.J., and BROWN, J., concur.

---

[3]The court has considered the appellants' motions to supplement the record and the State's response. The motions are denied.