[No. 30724-3-II.   Division Two.   June 22, 2004.]

GLORIA BROSCHART, *Respondent*, v. THE EMPLOYMENT SECURITY DEPARTMENT, ET AL., *Appellants*.

---

[39] *Id.*

258

*Christine O. Gregoire, Attorney General,* and *Mary C. Barrett, Assistant*; and *Louis A. Falcone,* for appellants.

*Matthew J. Bean,* for respondent.

260

BRIDGEWATER, J. — The State of Washington Employment Security Department (Department) denied Gloria Broschart's claim for unemployment benefits after she chose to participate in a program that severed her employment with Intalco Aluminum Corporation. An administrative law judge upheld the Department's decision. The commissioner's review office also affirmed the Department's decision. The superior court reviewed and reversed the commissioner's decision and granted benefits. The Department and Intalco both appeal the superior court's decision. We hold that Broschart failed to establish the necessary requirements of WAC 192-150-100 which would have entitled her to unemployment benefits—i.e., Intalco did not provide a written notice that layoffs or reductions were inevitable; Intalco did not select who would participate in the program; and Intalco did not take a final action to end an employee's employment. As well, Broschart did not leave her job because of a work-connected factor, thus she failed to establish good cause for leaving her employment and was not entitled to unemployment benefits. Accordingly, we reverse.

In 2001, prices for energy rose dramatically and supplies were scarce. In May 2001, Intalco reached an agreement with the Bonneville Power Administration (BPA) to temporarily cease using 90 percent of its power allotment. In order to carry out the agreement, Intalco had to temporarily stop the smelting process at its Ferndale, Washington smelter. The BPA in return agreed to pay Intalco for not using the curtailed power from October 1, 2001 through September 30, 2003. This was referred to as the curtailment period.

The Ferndale plant manager, Jim Frederick, held meetings with the employees to keep them informed of developments with the BPA. Intalco discussed its situation with the union that represented its production and maintenance employees and reached an agreement regarding how to proceed during the curtailment period. The agreement reached involuntarily laid off employees with less than two years' seniority. Broschart was not a member of this group.

Intalco and the union also agreed that Intalco would offer voluntary severance programs to all employees. The agreement also stated that Intalco would not involuntarily terminate employees during the curtailment period. But, the agreement also recognized that involuntary termination might be necessary.

After announcing the agreement, employees had the opportunity to ask questions of Frederick and others in management. One such question was about potential layoffs. At a May 24 meeting, an employee asked what the numbers were for early retirements/layoffs. Frederick responded that he did not know how many people would be in the potential layoff situation.

A compilation of meeting notes entered at the hearing showed that Intalco tried to keep people working but, due to uncertainty, Frederick was unable to conclusively say whether further layoffs would occur after the company laid off 24 people with less than two years' seniority. He thought there was a possibility of a total of 100 employee jobs lost because of the curtailment agreement.

Frederick sent an interoffice memorandum to all employees on June 25, 2001, announcing that voluntary severance programs would be offered to all employees. Intalco notified employees of the details on the various severance programs through employee mailings, e-mails, and employee meetings. These communications emphasized that the programs were voluntary. An employee could elect to participate in one of the voluntary severance programs starting on August 8, 2001. The last day to elect to participate was on September 23, 2001. To accept the voluntary severance program

offer, the employee simply had to sign an hourly separation agreement and mark the appropriate box. An employee had seven days after signing the agreement to change his mind on whether to proceed with the hourly separation agreement.

During this time, Intalco did not announce any further involuntary layoffs, terminations, or reductions-in-force beyond the 24 employees with less than two years' seniority. Due to the uncertainty of the future, Intalco had no plans for additional layoffs. And Intalco had not decided on the specific number of people it needed to remove from its work force when it made the voluntary severance offers.

Broschart accepted Intalco's offer on September 5, 2001, by checking the box on the form that stated: "I ACCEPT THE VOLUNTARY SEVERANCE OFFER" and signing the hourly separation agreement. Commissioner's Record (CR) at 462. After separating from Intalco, Broschart applied for unemployment benefits. Initially, the Department denied benefits because it determined that she voluntarily quit work without good cause even though work was available. Broschart requested a hearing to contest the Department's decision.

The hearing occurred on February 14-15, 2002.[1] At the hearing, Larry Dutton, Intalco's employee relations administrator, testified that after the involuntary layoff of 24 employees with less than two years' seniority, Intalco made no further announcement that there would be additional layoffs. He further stated that times were very uncertain and that the company had never discussed additional layoffs after announcing the voluntary severance programs.

Juanita Myers also testified at the hearing. Myers was the Department official responsible for drafting WAC 192--150-100, the employer-initiated layoff rule. On cross-examination, the State asked whether the rule was intended to apply to a situation where the employer did not announce a

---

[1] Broschart was 1 of 47 employees who participated in the voluntary severance program and was later denied unemployment benefits. At the hearing, one attorney represented all of the claimants.

layoff. Myers responded, "Correct." CR at 271. The State then asked, "Now this rule was not intended to apply to situations in which there is only a potential for a layoff at some unknown time; correct?" CR at 271. Again, Myers responded, "Correct." CR at 271.

Broschart introduced the Department's "Concise Explanatory Statement" at the hearing. CR at 1212. The statement illustrated some of the reasons for the new layoff rule. An addition to the rule was the inclusion of the language "in writing" to subsection (1)(a) of the rule. CR at 1212. The Department also separated out subsection (1)(a) into two separate clauses to show that both elements must be included by the employer. Under the new rule, the Department intended for no benefits to be paid to claimants where there was no formal written announcement of a layoff.

Broschart did not testify at the hearing. After the hearing on April 30, 2002, an administrative law judge (ALJ) from the Office of Administrative Hearings (OAH) affirmed the Department's decision. The decision had an improper appeal date on it, and OAH extended the appeal date from May 30 to June 5. Broschart filed a petition for review with the commissioner of the Department on June 5. The commissioner adopted all of the ALJ's findings of fact except findings 15 through 17. He also adopted conclusions of law numbers 1 through 4, 6, 15, and 18. The commissioner affirmed the decision denying benefits and mailed a copy of that decision to Broschart on July 12, 2002.

A statement in the commissioner's decision directed Broschart that she had 10 days from the mailing and/or delivery date of the commissioner's decision to file a petition for reconsideration. The petition was to be sent to the commissioner's review office, and all parties of record and their representatives were to receive a copy of the petition. Initially, Broschart sent her petition to the OAH. The OAH sent the form back to her. She then sent it to the commissioner's review office on July 29. The office denied the

petition on August 9. Broschart filed an appeal with the Thurston County Superior Court on September 10.

The Thurston County Superior Court heard Broschart's appeal on May 23, 2003. The court found that Broschart timely filed her petition for judicial review. The court also rejected Intalco's arguments regarding the timeliness of Broschart's filing of her petition for reconsideration and her petition for judicial review. Additionally, the court reversed the commissioner's decision because Broschart had established good cause for leaving her job. Without any discussion of WAC 192-150-100, the court found that Broschart was entitled to unemployment benefits. Because we hold that she is not entitled to unemployment benefits, we do not address whether Broschart timely filed her petition for judicial review.

## I. Standard of Review

We review the findings of a commissioner under chapter 34.05 RCW, the Administrative Procedure Act (APA). *Rasmussen v. Dep't of Employment Sec.*, 98 Wn.2d 846, 849, 658 P.2d 1240 (1983). We review the findings and decision of the commissioner, not the underlying ALJ order. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 405-06, 858 P.2d 494 (1993). We perform a de novo review of the commissioner's decision. *Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 390, 687 P.2d 195 (1984). We presume the commissioner's decision is prima facie correct and the petitioner has the burden of proving otherwise. *Safeco Ins.*, 102 Wn.2d at 391. Although we give deference to the agency's interpretation of its own regulations, we have the ultimate responsibility to see that the rules are applied consistently with the policy underlying the statute. *Safeco Ins.*, 102 Wn.2d at 392.

We review factual findings under the "substantial evidence" standard as described in RCW 34.05.570(3)(e). We grant relief from an agency order only where we determine that:

The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter.

RCW 34.05.570(3)(e). " 'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person of the truth of the declared premise." *Price v. Kitsap Transit*, 125 Wn.2d 456, 464, 886 P.2d 556 (1994) (citing *World Wide Video, Inc. v. Tukwila*, 117 Wn.2d 382, 387, 816 P.2d 18 (1991), *cert. denied*, 503 U.S. 986 (1992)).

## II. Employer-Initiated Layoffs

Intalco and the Department contend that Broschart failed to establish the elements of WAC 192-150-100, the employer-initiated layoffs rule, in order to voluntarily leave her job. We agree. Prior to discussing Broschart's failure to establish good cause to leave her job, a brief discussion of WAC 192-150-100 is helpful.

### A. Legislative History

In 2001, the Department adopted WAC 192-150-100. Previously, the rule regarding employer-initiated layoffs and reduction-in-force was found at former WAC 192-16--070 (2001).[2] The Department changed the rule because two Court of Appeals cases were in conflict over the meaning of former WAC 192-16-070.

---

[2] Former WAC 192-16-070 stated:

A layoff or reduction-in-force will not be considered to be a voluntary quit pursuant to RCW 50.20.050, if:

(1) The employer announced a layoff or reduction-in-force; and

(2) The claimant volunteered to be one of the people included in the layoff or reduction-in-force; and

(3) The employer determines which individuals are laid off or released through a reduction-in-force; and

(4) The employer accordingly laid off or released the claimant due to a reduction-in-force.

WAC 192-150-100, adopted in 2001, states:

(1) You will not be considered to have been separated from employment for a disqualifying reason when:

(a) Your employer takes the first action in the separation process by announcing in writing to its employees that:

(i) The employer plans to reduce its work force through a layoff or reduction in force, and

(ii) That employees can offer to be among those included in the layoff or reduction in force;

(b) You offer to be one of the employees included in the layoff or reduction in force; and

(c) Your employer takes the final action in the separation process by accepting your offer to be one of the employees included in the layoff or reduction in force, thereby ending your employment relationship.

(2) This section does not apply to situations where an employer modifies benefits or otherwise encourages early retirement or early separation, but the employer and the employee do not follow the steps in subsection (1)(a) through (c).

WAC 192-150-100.

The Department's "Concise Explanatory Statement," introduced at the hearing, illustrated that the Department did not intend for benefits to be paid where an employer made no formal, written announcement of layoffs. CR at 1212. Myers testified at the hearing that the rule was intended to apply only to a situation where the employer had announced a layoff. She further testified that the rule did not apply where there was "a potential for a layoff at some unknown time." CR at 271.

■ The above conversation with Myers and the "Concise Explanatory Statement" were part of the record the commissioner had for review of this case. An adjudicator may consider administrative history and any administrative documentation explaining the rule's intended purpose and effect to determine a regulation's meaning. *Cherry v. Mun. of Metro. Seattle*, 116 Wn.2d 794, 799, 808 P.2d 746 (1991). The commissioner found that the purpose of the

new regulation was to "deal with situations where the layoff or reduction in force is inevitable." CR at 1310. The commissioner took this language from the Department's "Concise Explanatory Statement" regarding WAC 192-150-100.

The Department explained that the rule applied only at the employer's option. The employer must announce a layoff in writing and offer its employees an opportunity to be included in the layoff. The Department further used the holding from *Nielsen v. Employment Security Department*, 93 Wn. App. 21, 966 P.2d 399 (1998), to explain the rule's purpose. *Nielsen* stated:

> The question is whether the layoff is mandatory in the sense of having been initiated and announced by the employer, not whether a particular individual had been named.
>
> . . . .
>
> The first act here was the announcement of impending layoffs. Without that, the claimants here had neither the right nor the incentive to elect to leave. Those layoffs were inevitable . . . .
>
> The last act was that of the employer accepting the employees' election to leave rather than run the risk of being first involuntarily terminated. They agreed to participate in a program that would ultimately lead to involuntary layoffs. The question was not whether, but when.

*Nielsen*, 93 Wn. App. at 39, 44.

■ Broschart argues that the superior court correctly reversed the commissioner's decision because that decision misinterpreted the regulation to require an inevitable layoff or reduction in force. But, as the administrative history shows, this was exactly the Department's intent. The rule was to apply only when the layoffs or reductions in force were inevitable, not where there was a potential for a layoff at some unknown future time.

## B. Analysis of WAC 192-150-100

Broschart voluntarily quit her job after Intalco announced its curtailment plan. Intalco had plans to

layoff only those people with less than two years' seniority. Broschart was not in that group. The commissioner found that Intalco never announced in writing any such layoff or reduction-in-force that might follow if sufficient numbers of its employees did not voluntarily leave.

■ Under WAC 192-150-100, in order for Broschart to qualify for benefits, she had to meet all the requirements of the rule. This she did not do. Although Intalco announced its curtailment plan, there was no formal layoff announcement in writing. WAC 192-150-100(1)(a)(i). Moreover, Intalco never accepted Broschart's offer to leave. WAC 192-150-100(1)(c). Those employees who decided to participate in the voluntary separation program had seven days to finalize their decision. During that period, they could change their minds and decide to stay with the company. After the seven days, their decision became final. Intalco had no power to decide which employees to accept in the program. It was the employee, not the employer, who took the final step toward separation by signing the hourly separation agreement.

Broschart argues that the commissioner's decision is inconsistent with case law. Specifically, Broschart refers to *Ortega v. Employment Security Department*, 90 Wn. App. 617, 953 P.2d 827, *review granted and later withdrawn*, 136 Wn.2d 1028 (1998), and *Nielsen v. Employment Security Department*, 93 Wn. App. 21. Although the rule applied in those cases (former WAC 192-16-070 was substantially different than WAC 192-150-100), these cases support the commissioner's decision.

In *Ortega*, Westinghouse Hanford was forced to reduce its labor force due to budget constraints and funding uncertainties with the Department of Energy. *Ortega*, 90 Wn. App. at 618. Westinghouse Hanford put into action a three-phase plan to reduce its work force. *Ortega*, 90 Wn. App. at 620. Ortega voluntarily elected to participate in the Special Voluntary Reduction of Force (SVROF) incentive program. *Ortega*, 90 Wn. App. at 618. Although employees could volunteer for the program, Westinghouse Hanford

retained the right to determine whether to accept an employee into the program. *Ortega*, 90 Wn. App. at 621.

Initially, an ALJ granted unemployment benefits to Ortega. *Ortega*, 90 Wn. App. at 619. The Department and Westinghouse Hanford appealed the decision, and a commissioner's delegate set aside the ALJ's decision. *Ortega*, 90 Wn. App. at 619-20. The delegate found that former WAC 192-16-070 did not apply to Ortega because her separation through the SVROF program was not a true layoff or reduction-in-force because employees had the choice to participate. *Ortega*, 90 Wn. App. at 620. The superior court reversed the delegate's decision, finding that the delegate ignored the plain language of former WAC 192-16-070. *Ortega*, 90 Wn. App. at 620.

Division One of this court found that the phrase "reduction-in-force" in former WAC 192-16-070 was limited to programs where the employer reduced the work force by imposing an involuntary reduction-in-force. *Ortega*, 90 Wn. App. at 624. The court further stated that for an employee to receive unemployment benefits under former WAC 192--16-070, the employee had to volunteer to participate in a "mandatory phase" of a layoff or reduction-in-force program. *Ortega*, 90 Wn. App. at 625. In that situation, the rule would permit an employee volunteering to participate "to leave employment without being considered to have voluntarily quit." *Ortega*, 90 Wn. App. at 625.

*Nielsen* arises from the same facts as *Ortega*. *Nielsen*, 93 Wn. App. at 24. Nielsen volunteered to leave his position under the SVROF program, and Westinghouse Hanford approved his application and authorized his release. *Nielsen*, 93 Wn. App. at 27. The Department denied Nielsen unemployment benefits, finding that he quit his job without good cause because his employer had not announced an involuntary reduction-in-force under former WAC 192-16--070(1). *Nielsen*, 93 Wn. App. at 27. Both the ALJ and the commissioner's delegate upheld the Department's decision. *Nielsen*, 93 Wn. App. at 27.

Division Three of this court held that the reduction-in-force program started at Westinghouse Hanford was exactly the type of "work-connected factors" qualifying employees as "voluntary quits" for good cause under RCW 50.20.050. *Nielsen*, 93 Wn. App. at 33. It further stated that Nielsen had established good cause to leave because of Westinghouse Hanford's announcement that it would be terminating 4,800 people. *Nielsen*, 93 Wn. App. at 42. In making its decision, the court noted that because Westinghouse mandated that 4,800 employees would be terminated if enough people did not participate in the voluntary severance program, Westinghouse's action equaled compulsion. *Nielsen*, 93 Wn. App. at 36. Further, Westinghouse made it clear that layoffs were inevitable and that the workers' specific job categories were targeted. *Nielsen*, 93 Wn. App. at 37. It was because of these conflicting opinions that the Department adopted WAC 192-150-100.

Unlike in *Ortega* and *Nielsen*, Intalco never mentioned the specific number of jobs it would terminate. At one point during a discussion with employees, Jim Frederick mentioned the possibility of losing 100 positions. Nor was Broschart's specific job a target of the potential layoffs. The only jobs targeted were those belonging to people with less than two years' seniority with Intalco. Broschart voluntarily quit her job after finding out that Intalco planned to implement a curtailment program.

In order for Broschart to receive benefits under WAC 192-150-100, she had to establish that she met all the regulatory requirements. First is the employer's written layoff announcement. WAC 192-150-100(1)(a). The record before us contains none. In fact, Intalco intended to lay off only the 24 people who had less than two years' seniority on their jobs. While it offered the voluntary reduction program, it never stated that if employees did not volunteer for the program, they would be involuntarily terminated.

Broschart asserts that a written interoffice memorandum to Intalco employees announced a reduction in the work

force through a layoff or reduction-in-force. But our review of the memorandum finds Broschart's assertion misleading. The document does not mention an impending layoff or reduction-in-force. It simply told employees about an early retirement program and voluntary furlough programs, and it gave dates for meetings to discuss the program details. Moreover, testimony from Intalco management shows there was no certainty that a layoff would occur. In fact, after the 248 employees separated from the company through the voluntary programs, no further layoffs or reductions-in-force occurred.

Additionally, Intalco had no control over who participated in the voluntary severance programs. WAC 192-150--100(1)(c). Once an employee accepted one of the agreements, Intalco could not then deny them the right to the program. Seven days after the employee's acceptance, their choice became final. Intalco did not take the final action to end an employee's employment relationship, the employee did. This situation does not meet the requirements of WAC 192-150-100(1)(c) and Broschart's claim fails. Substantial evidence supported the commissioner's decision and, thus, the superior court erred in reversing it.

## III. Good Cause

Without discussing the factors it considered, the superior court found that Broschart had established good cause to leave her job. Our review of the record shows that this finding was erroneous.

RCW 50.20.050(1)(c) states that the commissioner is to consider only work-connected factors in determining whether an employee voluntarily quit their job for good cause. WAC 192-16-009 directs that the work-connected factors causing an employee to leave their job must be of such a "compelling nature" that it causes "a reasonably prudent person to leave his or her employment" and that the employee exhausted all reasonable alternatives prior to terminating his or her employment. WAC 192-16-009(1)(a)-(c).

"[G]ood cause must be based upon existing facts as contrasted to conjecture" and the reasons the employee left employment must be significant. *Korte v. Employment Sec. Dep't*, 47 Wn. App. 296, 302, 734 P.2d 939 (1987). In this case, Broschart left because of possible future layoffs.

■■ ■ Broschart did not leave her job because of a work-connected factor. Although she argues that it was inevitable that Intalco would lay off people in order to meet its curtailment plan, the record does not support this argument. There is no conclusive evidence that Intalco would either have to lay off people or reduce its labor force if people did not take part in the voluntary severance program. In fact, Larry Dutton, who was the employee relations administrator, testified that there was never any discussion of what Intalco would do if enough people did not participate in the voluntary separation programs.

Additionally, there was no work-connected factor shown that would cause a reasonably prudent person to terminate his or her employment. That a company might lay off people or reduce its work force at some unknown time in the future is not good cause for leaving employment. Unlike in *Ortega* and *Nielsen*, Intalco never stated that a definite number of people would lose their jobs nor was Broschart's job targeted as part of a reduction-in-force program. Also, the agreement between Intalco and the BPA was one to preserve jobs. At the time that Broschart left, Intalco was moving people to different areas of the plant and finding jobs for people to do. There is no evidence in the record to support that further layoffs would have occurred if people had not taken part in the voluntary severance program. Thus, Broschart could not leave her employment simply because she feared impending layoffs.

Finally, it does not appear from the record that Broschart exhausted all her administrative remedies before leaving employment. In conclusion of law 15, the ALJ found that Broschart's claim of a future involuntary layoff was not a serious enough concern to cause Broschart to leave her job. The commissioner adopted this conclusion of law. In *Read v.*

*Employment Security Department,* 62 Wn. App. 227, 235, 813 P.2d 1262 (1991), the court held that the knowledge by claimants that layoffs might occur was insufficient to show good cause for leaving their employment. *See also Goewert v. Anheuser Busch, Inc.,* 82 Wn. App. 753, 761-62, 919 P.2d 106 (1996) (uncertainty about future employment is not a compelling work-connected factor for quitting employment but a personal reason), *review denied,* 131 Wn.2d 1005 (1997). *Korte,* 47 Wn. App. at 302 (the possibility of a substantial deterioration of work conditions because of a new employment contract was an insufficient reason to provide good cause for leaving employment). Broschart provides no evidence that she had no other choice but to leave her employment.

Broschart cannot show that she had good cause to leave her job with Intalco. As such, she does not qualify for unemployment benefits under RCW 50.20.050 and the commissioner's decision must be reinstated.

## IV. Subject Matter Jurisdiction

Because of our decision that Broschart is not entitled to unemployment benefits, we do not address Intalco's claim that we lack subject matter jurisdiction to hear the case and its due process arguments concerning the clerk's unilateral actions.[3]

## V. Attorney Fees

Broschart requests attorney fees under RAP 18.1 and RCW 50.32.100. Br. of Resp't 46. But, because the commissioner's decision is correct, the superior court's ruling must be reversed. Thus, Broschart cannot receive attorney fees for her appeal.

---

[3] At oral argument, the Department took no position on Intalco's jurisdictional and due process argument and asked that we address the substantive issue.

We reverse the superior court and affirm the Department's decision to deny unemployment benefits.

MORGAN, A.C.J., and VAN DEREN, J., concur.

Review denied at 153 Wn.2d 1024 (2005).