[Nos. 54772-1-I; 54870-1-I; 54871-9-I.    Division One.    June 13, 2005.]

Employees of Intalco Aluminum Corporation et al., *Respondents*, v. The Employment Security Department, *Appellant*.

---

*Robert M. McKenna, Attorney General,* and *Erika G. Uhl* and *Mary C. Barrett, Assistants*; and *Louis A. Falcone,* for appellant.

*Catherine Cabalo* (of *Brandt Law Group*), for respondents.

¶1 ELLINGTON, A.C.J. — Employees who accepted voluntary severance packages were denied unemployment benefits. Because there was no written layoff announcement and the employer did not take the final action to grant the severance, the employees do not qualify for benefits under the employer-initiated layoff rule. The employees' acceptance of voluntary severance did not constitute good cause to quit. The employees are therefore disqualified from benefits. We reverse the superior court and reinstate the commissioner's ruling denying benefits.

## BACKGROUND

¶2 In response to power shortages and rapidly rising energy prices, the Bonneville Power Administration (BPA) reached an agreement with Intalco Aluminum Corporation under which Intalco agreed to a temporary reduction in its power allotment. This resulted in a plan to halt aluminum production at Intalco's Ferndale smelter for two years, from October 1, 2001 through September 30, 2003. The BPA in return agreed to pay Intalco for not using the curtailed power.

¶3 To address the production halt, Intalco reached an agreement with the union representing its production and maintenance workers whereby 24 employees with less than

two years' seniority would be laid off, the remaining employees would be paid their base rate of pay during the shutdown, and Intalco would offer voluntary severance programs to all hourly employees.

¶4 Intalco sent a memorandum to hourly employees announcing three voluntary severance programs (voluntary severance, early retirement, and furlough), advising that any employee could elect to participate in one of the programs during a six-week sign-up period. An employee who elected one of the programs had seven days thereafter to change his or her mind. Intalco did not reserve the right to reject an employee's election. Of 930 employees, 280 elected to accept one of the programs and terminate their employment with Intalco.

¶5 After accepting the voluntary severance program, 48 employees applied for unemployment benefits. The Employment Security Department (the Department) denied benefits on grounds that the employees voluntarily terminated their employment. An administrative law judge (ALJ) from the Office of Administrative Hearings affirmed the Department's decision, and that ruling was affirmed by the commissioner.

¶6 One employee appealed to Thurston County Superior Court, and the other 47 appealed to Whatcom County Superior Court. Both superior courts reversed the Department and granted benefits. Division Two reversed the Thurston County Superior Court case and reinstated the commissioner's decision.[1] We now consider the appeal from Whatcom County.

## ANALYSIS

¶7 *Standard of Review.* The findings of a commissioner are reviewed under chapter 34.05 RCW, the Admin-

---

[1] *Broschart v. Employment Sec. Dep't,* 123 Wn. App. 257, 95 P.3d 356 (2004), *review denied,* 153 Wn.2d 1024 (2005). The record in *Broschart* is identical to the record here.

istrative Procedure Act.[2] The appellate court reviews the findings and decision of the commissioner, not the superior court decision or the underlying ALJ order.[3] This review is performed de novo.[4] The commissioner's decision is presumed prima facie correct and the petitioner has the burden of proving otherwise.[5]

¶8 *Employer-Initiated Layoff Rule.* Generally, unemployed workers are eligible for benefits unless they are disqualified by statute.[6] A worker is disqualified if he or she voluntarily leaves work without good cause.[7] One exception to this rule is the so-called employer-initiated layoff rule, which provides that after a layoff has been announced, an employee may volunteer to be among those laid off, and still be eligible for benefits. The question is whether this exception applies here.

¶9 The employer-initiated layoff rule is found in WAC 192-150-100:

(1) You will not be considered to have been separated from employment for a disqualifying reason when:

---

[2] *Rasmussen v. Dep't of Employment Sec.*, 98 Wn.2d 846, 849, 658 P.2d 1240 (1983).

[3] *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 405-06, 858 P.2d 494 (1993).

[4] *Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 390, 687 P.2d 195 (1984).

[5] *Id.* at 391.

[6] *Goewert v. Anheuser Busch, Inc.*, 82 Wn. App. 753, 756, 919 P.2d 106 (1996).

[7] RCW 50.20.050(1). WAC 192-16-009(1) provides the general rule for good cause determinations:

[I]n order for an individual to establish good cause within the meaning of RCW 50.20.050(1) for leaving work voluntarily it must be satisfactorily demonstrated:

(a) That he or she left work primarily because of a work connected factor(s); and

(b) That said work connected factor(s) was (were) of such a compelling nature as to cause a reasonably prudent person to leave his or her employment; and

(c) That he or she first exhausted all reasonable alternatives prior to termination: Provided, that the individual asserting "good cause" may establish in certain instances that pursuit of the otherwise reasonable alternatives would have been a futile act, thereby excusing the failure to exhaust such reasonable alternatives.

(a) *Your employer takes the first action in the separation process by announcing in writing to its employees that*:

(i) *The employer plans to reduce its work force through a layoff or reduction in force, and*

(ii) That employees can offer to be among those included in the layoff or reduction in force;

(b) You offer to be one of the employees included in the layoff or reduction in force; and

(c) *Your employer takes the final action* in the separation process by accepting your offer to be one of the employees included in the layoff or reduction in force, thereby ending your employment relationship.

(2) This section does not apply to situations where an employer modifies benefits or otherwise encourages early retirement or early separation, but the employer and the employee do not follow the steps in subsection (1)(a) through (c).

(Emphasis added.)

¶10 Division Two held that Broschart failed to establish two of the necessary requirements of WAC 192-150-100: written notice of layoffs (WAC 192-150-100(1)(a)(i)), and the employer's final action ending the employment (WAC 192-150-100(1)(c)).[8] We agree with Division Two's analysis and reach the same conclusion.

■ ¶11 *Written Notice.* For employees to be eligible for benefits under the employer-initiated layoff rule, the employer must take the first action in the separation process by announcing *in writing* its plans to reduce its work force through a layoff or reduction in force.[9] The requirement of a writing is recent. Former WAC 192-16-070 (1993) required only that the employer announce a layoff.[10] Conflict-

---

[8] *Broschart*, 123 Wn. App. at 270-71.

[9] WAC 192-150-100.

[10] The regulation provided:

A layoff or reduction-in-force will not be considered to be a voluntary quit pursuant to RCW 50.20.050, if:

(1) The employer announced a layoff or reduction-in-force; and

ing interpretations of the former rule[11] led to an amendment in 2001, requiring that the layoff announcement be made in writing "to clarify that the regulation refers to formal offers from an employer, not situations in which there is a potential for layoff at some unknown time."[12]

¶12 Nothing in the record constitutes a written layoff announcement from Intalco. The employees contend the word "reduction" in the "voluntary reduction options" documents and in internal memos amounts to a written announcement, pointing out that Intalco's employee relations administrator conceded it referred to a "reduction of [Intalco's] workforce."[13] But the documents and memos merely describe the three voluntary options, which were not layoffs,[14] and the phrase "reduction of the work force" described a "design[ ] to encourage people to take early severance or early retirement."[15] The voluntary severance options in fact achieved a reduction in the work force, but not by means of layoff. The documents were not the equivalent of a written layoff announcement.

---

(2) The claimant volunteered to be one of the people included in the layoff or reduction-in-force; and

(3) The employer determines which individuals are laid off or released through a reduction-in-force; and

(4) The employer accordingly laid off or released the claimant due to a reduction-in-force.

Former WAC 192-16-070 (1993), *repealed by* St. Reg. 01-12-009 (May 24, 2001).

[11] *See Ortega v. Employment Sec. Dep't*, 90 Wn. App. 617, 625, 953 P.2d 827 (1998) (holding Westinghouse Hanford employees not eligible for benefits because participation in voluntary separation program was voluntary and did not take place during a mandatory phase of a layoff program); *Nielsen v. Employment Sec. Dep't*, 93 Wn. App. 21, 24, 966 P.2d 399 (1998) (holding employees in same voluntary program were eligible for benefits).

[12] Commissioner's R. at 271 (testimony of Juanita Myers, the Department official responsible for drafting the rule).

[13] Resp't's Br. at 30.

[14] "Layoff" is defined as "the termination of employment at the employer's instigation." BLACK'S LAW DICTIONARY 906 (8th ed. 2004).

[15] Commissioner's R. at 78.

■ ■ ¶13 The employees next argue that the commissioner added a new requirement that layoffs be "inevitable."[16] The commissioner took this language from the Department's explanatory statement regarding WAC 192--150-100.[17] An adjudicator may consider administrative history and administrative documentation explaining the intended purpose and effect of a rule when determining its meaning.[18] In context, "inevitable" means nothing more than that the employer has confirmed the layoffs will occur. As Division Two noted in *Broschart*, "[t]he rule was to apply only when the layoffs or reductions in force were inevitable *not where there was a potential for a layoff at some unknown future time*."[19] Written announcements of layoffs fulfill the inevitability requirement, whereas potential future layoffs do not.

■ ■ ¶14 *Final Action by Employer.*[20] The employees also contend that Intalco took the final action required by WAC 192-150-100(1)(c)[21] by processing the paperwork terminating the employees who elected voluntary separation.

---

[16] The Commissioner's decision stated: "[I]t is apparent that there must be a written announcement by the employer of an 'inevitable' layoff . . . for which an employee can offer to be included." Commissioner's R. at 1310.

[17] The explanatory statement states in part: "The regulation is designed to deal with situations where the lay-off or reduction in force is inevitable. It applies solely at the option of the employer, who must announce a layoff (in writing) AND offer employees the opportunity to be included in that layoff." Commissioner's R. at 1213.

[18] *Broschart*, 123 Wn. App. at 266.

[19] *Broschart v. Employment Sec. Dep't*, 123 Wn. App. 257, 267, 95 P.3d 356 (2004), *review denied*, 153 Wn.2d 1024 (2005) (emphasis added).

[20] The employees contend that because the commissioner did not adopt the ALJ's conclusion of law 5 (that Intalco did not take the final step), we should decline to defer to the commissioner's interpretation of the law. We first note that the commissioner did adopt the ALJ's conclusion of law 6, that the job separations did not meet the requirements of WAC 192-50-100 because Intalco did not make a layoff announcement in writing or take the final action. But any lingering inconsistency in these facts and theories is irrelevant to the question of deference to the agency's legal interpretations. To the extent we defer, we defer not to the commissioner's factual findings, but rather to the Department's interpretation of the statutes and rules, as expressed in its explanatory documents and its official's testimony. *Safeco Ins. Cos. v. Meyering*, 102 Wn.2d 385, 390, 687 P.2d 195 (1984).

[21] "Your employer takes the final action in the separation process by accepting your offer to be . . . included in the layoff or reduction in force."

This is incorrect. The clerical paperwork is not the final action contemplated by the regulation. As noted by Division Two, "Intalco had no control over who participated in the voluntary severance programs."[22] Under Washington law, an offer is accepted and becomes contractually binding by the actions of a person signing an agreement presented as an offer.[23] Here, Intalco offered the voluntary programs to every hourly employee, and retained no control over who elected to participate. Once Intalco's offer was formally accepted, the deal was binding on Intalco. Under these circumstances, the employees who accepted the severance package took the final action in the separation process.

¶15 *Good Cause to Quit.* An employee who quits voluntarily is eligible for benefits if the separation was based upon good cause. The commissioner found the employees' separations were due to concerns regarding the long term prospects of employment with Intalco, which did not constitute good cause. This too was correct.

¶16 To have good cause for severing employment so as to be eligible for benefits, an employee must leave work primarily because of work-connected factors of such compelling nature as to cause a reasonably prudent person to leave, after exhausting all reasonable, nonfutile alternatives.[24] The commissioner must consider only work-related factors brought about by the employer.[25] "Good cause must be based upon existing facts as contrasted to conjecture, and . . . reasons for leaving employment must be significant."[26] This court has consistently held that the mere

---

[22] *Broschart*, 123 Wn. App at 271. *See also Nielsen*, 93 Wn. App. at 39 (the last step in the termination process was taken by the employer *who retained the authority to accept the application and release the employee or reject it*).

[23] *Yakima County (W. Valley) Fire Prot. Dist. No. 12 v. City of Yakima*, 122 Wn.2d 371, 388-89, 858 P.2d 245 (1993).

[24] RCW 50.20.050(2)(b); WAC 192-16-009(1)(a)-(c).

[25] *Terry v. Employment Sec. Dep't*, 82 Wn. App. 745, 749-51, 919 P.2d 111 (1996).

[26] *Korte v. Employment Sec. Dep't*, 47 Wn. App. 296, 302, 734 P.2d 939 (1987) (possible change in working conditions was conjecture only and did not provide good cause to leave).

possibility of a future layoff does not constitute good cause.[27]

¶17 The employees nonetheless assert that good cause existed because "the atmosphere created by Intalco made the claimants fear for their jobs and their livelihoods."[28] They point to the power usage curtailment agreement with the BPA as creating a reasonable apprehension of future layoffs. But the purpose of that agreement was to preserve jobs: "Alcoa will not involuntarily terminate employees due to the curtailment, but may design and offer a voluntary program for employee separation."[29] The fact that the agreement acknowledged that "involuntary termination may be necessary" does not, standing alone, create an atmosphere of inevitable layoffs. Further, the agreement with the union required Intalco to pay all remaining hourly employees (including all those involved here) their base pay for full time work for the two-year curtailment period.

¶18 The employees assert that a reduction in force "was absolutely necessary" and that "wide-scale lay-offs . . . would most certainly have ensued."[30] These assertions are unsupported by the record. No layoffs occurred at Intalco as a result of the two year curtailment except for the 24 least senior employees originally announced. Whether this number might have been different had fewer employees accepted voluntary separation packages is simple conjecture, which is not enough to constitute good cause.[31]

---

[27] *See Read v. Employment Sec. Dep't,* 62 Wn. App. 227, 235, 813 P.2d 1262 (1991) (knowledge by claimants that layoffs might occur was insufficient to show good cause); *Goewert,* 82 Wn. App. at 761 (uncertainty about future employment is not a compelling work-connected factor but rather is a personal reason); *Broschart,* 123 Wn. App. at 272 (employee did not have good cause to leave under facts identical to those at issue here); *Ortega,* 90 Wn. App. at 625 (voluntary participation in severance programs does not constitute good cause).

[28] Resp't's Br. at 17.

[29] Commissioner's R. at 1271.

[30] Resp't's Br. at 23.

[31] *Ortega,* 90 Wn. App. at 625.

## CONCLUSION

¶19 The purpose of the Employment Security Act, Title 50 RCW, to lighten the burden on persons unemployed through no fault of their own is not furthered by providing unemployment benefits where an employee participates in a voluntary severance program under no threat of involuntary termination. The decision of the superior court is reversed, and the Department's denial of benefits is reinstated.

BAKER and APPELWICK, JJ., concur.